No. 85-488

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

MONTANA-DAKOTA UTILITIES CO.,
a Delaware corporation,

        Plaintiff and Appellant,

-vs-

MONTANA DEPARTMENT OF PUBLIC SERVICE
REGULATION, MONTANA PUBLIC SERVICE
COMMISSION, MONTANA CONSUMER COUNSEL,

        Defendants and Respondents.

---

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Gordon Bennett, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Hughes, Kellner, Sullivan & Alke; John Alke argued,
Helena, Montana

    For Respondent:

        James C. Paine argued, Montana Consumer Counsel,
Helena, Montana
Robert A. Nelson argued, Public Service Commission,
Helena, Montana

---

Submitted: July 22, 1986

Decided: September 11, 1986

Filed: SEP 11 1986

*Ethel M. Harrison*
———————————————————
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

I.

On August 24, 1983, Montana-Dakota Utilities Co. (MDU) filed an application with the Montana Department of Public Service Regulation and Montana Public Service Commission (PSC) for rate increases in its revenue for gas service in the State of Montana of $7,917,936. The Montana Consumer Counsel (Counsel) intervened as a party and has participated at all times since in the case.

After extensive hearings and submission of briefs, PSC issued on May 28, 2984, order no. 5020b approving increased rates for MDU. These increased rates were expected to produce additional revenues of $5,701,374.

On June 8, 1984, MDU filed a motion before PSC for reconsideration of PSC findings relating to the treatment of gain on reacquired debt and cost of equity capital as well as its findings on other issues. On June 26, 1984, PSC issued its order no. 5020c, which granted reconsideration of an unrelated issue, but denied reconsideration of the treatment of the gain on reacquired debt, or cost of equity capital.

MDU subsequently filed its petition for judicial review in the District Court, First Judicial District, Lewis and Clark County. For the purposes of the District Court, the parties stipulated to an abbreviated administrative record. That record, together with the District Court's opinion and order, constitute the record before this Court in this appeal.

The judicial review in the District Court culminated in that court's final opinion and order of June 24, 1985. Two

principal issues in that opinion and order give rise to the appeals now before us. The District Court held that PSC erred in requiring that the unamortized gain realized from reacquisition of a long term debt be deducted from the MDU rate base. The District Court also determined that PSC acted correctly in authorizing MDU a return on equity capital of 13.35%.

PSC and Counsel appealed to this Court the decision of the District Court that it is improper to require MDU to deduct the unamortized gain on reacquired debt from its rate base. On this point of appeal, we reverse the District Court.

MDU appeals from the determination by the District Court that PSC properly assigned a percentage rate of 13.35% as return on equity capital for MDU. On this point of appeal we affirm the District Court.

II.

We first discuss the standard and scope of judicial review both in this Court and in the District Court of an order promulgated by PSC, and the issue of cost of equity capital.

MDU contends that the District Court did not properly review PSC's decision on rate of return for equity capital in that (a) the District Court refused to review whether PSC's actions were arbitrary and capricious; (b) the District Court improperly assumed the role of PSC and made findings and conclusions where PSC failed to make necessary findings and conclusions; and (c) the District Court misapplied the clearly erroneous standard in its review of PSC's decision on rate of return.

MDU points to the decision of PSC, nearly contemporaneously, in the Montana Power Company rate increase case, where PSC granted Montana Power Company a rate of return on equity capital of 14.25%. MDU contends that PSC granted the disparate rates without explanation. In the Montana Power Company case, PSC considered updated evidence on such cost of capital from capital markets through the first quarter of 1984. However, PSC refused to consider, on MDU's request for reconsideration, evidence of the cost of such capital after December 31, 1983. MDU claims that PSC has played favorites thereby, and that the error is more egregious because in each case PSC relied on the same witness to approve the different percentages of return.

PSC and Counsel respond to MDU's contention as follows: The record in MDU's case was closed at the end of the hearings in January, 1984; the Montana Power Company record was not closed when Dr. Smith testified in May, 1984; MDU made no effort to enlarge the record either under § 38.2.4805 ARM, before PSC, or § 69-3-404, MCA, before the District Court, and it is improper to base a claim of arbitrariness and caprice on matters outside the record of the instant case. The PSC and Counsel further argue that in any event, the new information which MDU supplied as a part of its motion for consideration consisted of a bond report from a single brokerage house which showed that for the twelve months ending June, 1984, for A-rated utilities, the high yield for long term bonds was 15.13% and the low yield was 11.50%. Such a range, PSC concluded, showed the volatility of the market at the time. Moreover, PSC points out that § 69-3-302, MCA, requires that a final decision on rate cases be made by PSC within 9 months of the date of

application which in the MDU docket meant a deadline of May 24, 1984. In the Montana Power Company case, the parties had waived the deadline because of the more complicated record and the number of intervenors in that case.

We determine that PSC did not act arbitrarily or capriciously on the basis that it found a certain percentage figure for return on cost of equity in the Montana Power Company case and a lesser percentage figure for return on cost of equity in the MDU case. The District Court did not discuss this argument of MDU in its findings and conclusions, but then the District Court was required by law to confine its review to the record. Section 2-4-704; § 69-3-404, MCA. MDU had the right, which it did not use, to open the record at the District Court level for additional material evidence if good reasons existed for failure to present the evidence in the proceeding before the agency. Section 69-3-404(3), MCA. Of course, the record before the District Court and before us, includes the motion for reconsideration made by MDU after the final order of May 18, 1984. With the motion for reconsideration MDU had presented to PSC a bond chart from a brokerage company. As PSC found, the bond chart was insufficient to require an increase in the percentage of the cost of equity because it mostly showed the volatility of such percentage rates at the time. Moreover, as the Court said in Washington Gas Light Company v. Public Service Commission of the District of Columbia (D.C. App. 1982), 450 A.2d 1187, while it may be an abuse of discretion for an agency to ignore the most recent data in the record of a proceeding, the same cannot be said as easily for evidence submitted after the record has been closed and a final opinion issued.

The platitude that one cannot compare apples to oranges is worn thin, but it applies here. The two different percentage figures do not spring from the same record; they are not comparable. As MDU contends, the District Court acted properly in not considering whether the PSC decision was arbitrary and capricious because it approved two different percentage figures for return on cost of equity.

In the second phase of this issue, MDU contends that the District Court improperly assumed the role of PSC and made findings and conclusions in areas where the PSC itself failed to make necessary findings and conclusions.

The source of MDU's contention is that the District Court discussed two economic theories of Dr. Smith in her assessment of a proper rate of return on equity capital, whereas PSC in its final order did not discuss those theories. Thus, MDU contends, the District Court made findings and conclusions outside the record not made by the PSC and so acted out of the scope of its power of judicial review.

It is, of course, the duty of PSC to make explicit findings on material issues raised in the administrative proceedings. Northern Plains Resource Council v. Board of Natural Resources (1979), 181 Mont. 500, 522-23, 594 P.2d 297, 310. The findings must be sufficient to permit thorough judicial review, State ex rel. Olsen v. Public Service Commission (1957), 131 Mont. 104, 113, 308 P.2d 633, 638, and the findings on material issues should be sufficient to permit a reviewing court to follow the reasoning process of the agency and determine whether that process conforms to law. Northern Plains Resource Council, supra; Public Service Commission of Montana v. District Court (1973), 162 Mont.

- 6 -

225, 511 P.2d 334. Upon judicial review, the validity of the decision must be judged on the grounds and reasons set forth in the order, and no other grounds should be considered. Burlington Truck Lines, Inc. v. U.S. (1962), 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216.

MDU contends that the District Court assumed the role of PSC and analyzed Dr. Smith's theories that "investors discount outliers" and her theory of a "negative risk premium." The District Court, argues MDU, approved the acceptance of these theories by PSC, but PSC did not accept them nor acknowledge their existence in its final order.

In determining the rate of return of 13.35% for equity capital, PSC relied on a combination of factors. It determined the current dividend yield for MDU at 9.2%. On that determination there appears to be no issue between the parties. It is the expected growth of that yield as perceived by prospective investors that is controversial. MDU had a compound growth rate of 12% in its dividends for the past 5 years. Dr. Smith, in her analysis, calculated expected growth according to three formulae: Single best growth rate, most important growth rates (growth in book value and growth in earnings); and all growth rates. For these she calculated 2.27%, 2.92% and 5.39% respectively. PSC rejected the "single best growth rate," as an extreme low based on a single growth factor, and adopted the other two growth rates because of "the strong statistical correlation of the two growth rates to dividend yields." The said growth rates averaged 4.15, which added to the established dividend rate of 9.2, gave PSC a proper cost of common equity at 13.35%.

In explaining why investors in MDU equity did not include in their expectations a continued growth in dividends of 12%, Dr. Smith stated, "investors discount outliers." An "outlier," it might be explained, in the case of MDU, is a company that is outstripping other companies in the gas utility business in the annual growth of its dividends. Dr. Smith's testimony also included this statement:

> That investors do not rely upon historical dividend growth as an important proxy for future dividend growth is reasonable on their part, as dividend growth has been greater than both earnings or book value growth over much of the past decade. If dividend growth were to remain in excess of earnings growth, payout ratios would reach and remain greater than unity and utilities would eventually pay out all previously-retained earnings as dividends. As previously-retained earnings are paid out, book value growth will turn negative and the earnings base for future dividend payments will be diminished further. In fact, the observed decline in utility book value growth is attributable, in part, to higher payout ratios.

The District Court concluded that the "outlier" theory and the "negative risk premium" theory were not clearly wrong, and PSC was free to embrace them.

In the hearing before PSC, MDU brought Ian B. Davidson, chairman of a brokerage house in Great Falls, to refute Dr. Smith's comment about outliers. He testified that her opinion about expected growth of dividends for MDU had little relation to what investors were in fact expecting. He contended that investors would in fact look at the growth of dividends experienced by MDU and that they would expect MDU to gross significantly above the industry average of 5% to 6% and probably in the range of 8% to 10% growth.

In its findings, PSC agreed with Dr. Smith's analysis of MDU versus industry risk, and further stated that it agreed with Dr. Smith's risk analysis as an accurate representation of MDU's risk in relation to that of the utility industry as

a whole. With respect to the expected future dividend growth rate, PSC concluded that "maintaining such a level in the long run seems unrealistic, especially considering [counsel's] cross examination of Mr. Davidson concerning earned return five years in the future while experiencing high levels of compound growth."

While PSC did not expressly refer in its final order of May 18, 1984 to "outliers" or to "negative risk premium" it is patent from its findings and conclusions that it had in mind the whole of Dr. Smith's testimony in adopting her evaluation of a perception of investor's risk for MDU in the future. We find no substance therefore in MDU's contention that the District Court usurped the role of PSC in commenting upon the explanations utilized by Dr. Smith in determining the expected dividend growth of MDU equity capital.

Thirdly under this heading, MDU contends that the District Court misapplied the clearly erroneous standard in its review of PSC's decision on rate of return.

MDU's argument here essentially is that proper judicial review requires a review of the whole record, not only the evidence purporting to support the PSC decision, but also that which would tend to detract from it, and although the Court must not reweigh the evidence, the District Court cannot ignore the effect of clearly contrary evidence. So, MDU points again to Dr. Smith's testimony, and contends that her theory that "investors discount outliers" was not substantiated in discovery before the hearing nor at the hearing, and as unsubstantiated, is entitled to little evidentiary weight. Montana Citizens Freight Rate Association v. Board of Railroad Commissioners (1954), 128 Mont. 127, 134, 271 P.2d 1024, 1027.

Section 69-3-402, MCA, provides that a party in interest dissatisfied with an order of PSC may proceed in District Court to vacate such order on the grounds that the order is unlawful and unreasonable. The burden of proof is upon the party attacking or resisting the order of PSC to show that the order is unlawful or unreasonable, as the case may be. Section 69-3-402(4), MCA.

Under the Montana Administrative Procedure Act (MAPA), a person who has exhausted all administrative remedies available within the agency and is aggrieved by a final decision in a contested case is entitled to judicial review under § 2-4-702, MCA, et seq. Section 2-4-702 is careful to state that it does not limit utilization or judicial review available under other statutes. In setting the standards of review, § 2-4-704, MCA, provides that the District Court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the decision, among other reasons, is "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record."

If a party contends that the order of PSC is unreasonable, it is creating a fact issue, and under § 69-3-402(4), MCA, that party has the burden of proof before the reviewing court on the issue. If it is contending that the order or decision of PSC is unlawful, the appealing party has the burden to show PSC abused its discretion. Thus we stated in City of Billings v. Billings Firefighters Local No. 521 (Mont. 1982), 651 P.2d 627, 632, 39 St.Rep. 1844, 1849:

> Pursuant to that statute, [§ 2-4-704, MCA] findings of fact by an agency have been subject to a "clearly erroneous" standard of review by the courts. Wheatland County v. Bleeker (1978), 175 Mont. 478, 575 P.2d 48. Conclusions of law are subject to "an abuse of discretion review." These standards differ due to the agency's expertise

> regarding the facts involved, and the court's
> expertise in interpreting and applying the law
> . . .

MDU argues that an agency decision is not sustainable just because there is some evidence in the record to support it. It contends that "the scintilla of evidence" standard has been rejected as an abdication of the court's responsibility to insure due process of law, citing Billings Utility Company v. Public Service Commission (1921), 62 Mont. 21, 35, 203 P. 366, 368. Nevertheless, with PSC, as with other agencies, what we said in City of Billings, supra, at 632, still pertains:

> . . . the factual findings of the BPA [Board of Personnel Appeals] will be upheld if supported by substantial evidence. Section 39-31-409(4), MCA. MAPA allows factual findings to be overturned when they are "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." Section 2-4-704(2)(e), MCA. We find these tests to be harmonized. If there is substantial credible evidence in the record, the findings are not "clearly erroneous." Under either statute the scope of judicial review is the same. If the record contains support for the factual determinations made by the agency, the courts may not weigh the evidence. They are bound by the findings of the agency.

On this point, MDU contends that since Dr. Smith's opinions are unsubstantiated, and since their witness, Mr. Davidson, who deals with thousands of investors every year, testified that investors do not believe as Dr. Smith testified, the "outlier" theory should have been rejected by the District Court and by implication should be rejected by us. What is lost in this argument is that both Dr. Smith and Mr. Davidson were each trying to predict the future and what it holds for MDU. The District Court noted that the "outlier" theory seemed to be substantiated by its proponents' unchallenged statistics. The PSC, faced with the task of determining the future from the evidence of opinions

- 11 -

before it, chose the conservative side, setting forth in its findings its reasons for adopting the rationale it followed. MDU, before the District Court, and before us, has the burden to show that PSC abused its discretion in this regard so as to have acted unlawfully or unreasonably. We find no abuse of discretion by PSC. Substantial credible evidence supports its findings, which are therefore not clearly erroneous.

We affirm the District Court on this point of appeal.

III.

MDU issues and sells to investors long-term bonds to finance plant. Under sinking fund provisions, MDU must reacquire and retire some of such bonds before maturity. If the reacquisition occurs at periods of higher interest rates, the bonds are reacquired at a discount from face value. The discount represents a gain to the utility.

PSC ordered that the gain on reacquired debt be amortized over the remaining life of the indebtedness, the amortized amount to reduce interest expense to the utility. PSC further ordered that the unamortized amount be treated as a rate base reduction.

MDU objected to the reduction of rate base by the unamortized gain, and the District Court agreed, holding that such reduction has the effect of confiscation without due process. The District Court held that the gain should be reflected in the periodic reduction of the utilities' cost of debt, as a "subtraction on the cost of service side of the ledger resulting in a saving to the consumer."

All parties agree that since the debt represented by such bonds and their interest cost during the existence of the bonds must be paid by the rate payer, any reduction of the bonded debt should be passed on to the rate payer, and

not to the shareholders. All parties agree that at the least, the amortized portion of the gain over the life of the remaining indebtedness had the bonds not been reacquired should be used to reduce the utilities' interest costs (the reference by the District Court to the "cost of service" undoubtedly refers to debt service).

Of course, it would not be improper accounting to recognize the full amount of the gain in the year of acquisition. The parties point out that some regulatory bodies permit that for rate purposes. However, in Re Manufacturers Light and Heat Company (1970), 84 P.U.R.3d 511, the Federal Power Commission (now the Federal Energy Regulatory Commission) found that amortization of such gain over the remaining life of the indebtedness was required to pass the gain on to the consumers. Otherwise, recognizing the full gain in the year of acquisition could result in not passing the benefits to the consumers. The FERC subsequently adopted regulations for accounting which require utilities regulated by it to amortize such gain (or loss) equally on a monthly basis over the remaining life of the respective security issues reobtained. When amortization of the gain is utilized, the amortized amount is subtracted from the test period interest expense in determining the utility's cost of debt. Consolidated Gas Supply Company v. FERC (4th Cir. 1981), 653 F.2d 129, 135.

In a prior rate case involving MDU, stipulated as part of the record here, PSC accepted the testimony of Dr. Smith on the subject which follows:

> . . . All of the reacquired bonds are sinking fund bonds which must be retired on an annual basis over the life of the debt, according to the sinking fund requirements for each bond. Because of this, the reacquisition and retirement of the debt before its

maturity debt is necessary. At the same time, the gain should be credited to customers, just like the interest expense on these bonds has been charged to them while they were outstanding. MDU has not credited the gain to customers.. . . The unamortized gain is included on the balance sheet as a deferred credit, just like deferred income taxes, and can be accounted for as a zero-cost capital structure item or as a rate base reduction. I have included it as a zero-cost capital structure item.

The PSC in that case noted that a rate base reduction was the equivalent of treating the gain as a zero-cost capital item. It stated:

26. The Commission agrees with Dr. Smith that the unamortized gain has some similarity to deferred taxes for rate making purposes. In previous decisions, the Commission has treated deferred taxes as a rate base reduction rather than as a zero-cost capital item (example: Order No. 4928a in Docket No. 82.4.28). Including deferred taxes and capital structure as zero-cost produces about the same result as deducting the amount from rate base.

In the case at bar, the rationale of PSC in determining its treatment of the unamortized gain may be found in its finding no. 67, where PSC stated:

. . . In past cases, when the Commission has treated deferred taxes as a rate base reduction because it is a deferred credit and has no return requirement. Unamortized gain is also a deferred credit. The Commission finds that because of the reacquisition of the debt at a discount, a cash savings to MDU results which is accounted for as a gain. By deducting the unamortized portion of the gain from rate base, the Commission is precluding the Company from earning a return on the unamortized balance of the gain, and, therefore, allowing the consumer to realize full benefit from the transaction. The Commission finds that the unamortized gain is a deferred credit, similar to deferred taxes, for rate making purposes. The Commission determines, therefore, that the unamortized gain on reacquired debt should be treated as an allocated deduction from rate base in the amount of $218,562, using the approved allocation factors.

It is important to know the reasons given by the District Court for holding PSC decision on unamortized gain confiscatory. Most obviously, the District Court was

disturbed that the amortized portion of the gain was treated to reduce interest expense (cost of borrowing) while concurrently the unamortized gain was used to reduce rate base. The court noted ample authority for amortizing the gain as against interest costs, but noted no authority for concurrent rate base reductions. Moreover, the District Court found that the unamortized gain represented a liability that must be discharged over the remaining life of the original obligations; that reacquired bonds were probably replaced by new bonds; that the actual investment in plant was not reduced; and the District Court distinguished between unamortized gain and deferred income taxes, saying that on the one hand deferred income taxes result from monies paid in by consumers, but the gain on reacquired debt comes from investors. A gain on reacquired debt does not represent money actually received by the utility. The District Court determined that to deduct the unamortized gain (the phantom profit) from the rate base while at the same time applying the amortized gain to reduce interest expense compounded the reduction in consumer rates and provided an unjustified windfall for the rate payer at the expense of the utility's stockholders. MDU relies on these contentions in this appeal.

The arguments of PSC and Counsel on appeal negative the determinations of the District Court and the contentions of MDU. They point to the MDU balance sheet which lists unamortized gain on reacquired debt under the heading of deferred credits. They point out, as did PSC, that deferred credits are routinely subtracted from the rate base. They contend that since all parties agree under Manufacturer's Light and Heat Company, supra, the gain should be fully

- 15 -

refunded to the rate payer, full compensation cannot be accomplished without deduction of the unamortized gain from the rate base.

Counsel cites the example of a utility which reacquires its $1000 bond for $900. The original $1000 received from the investor was presumably utilized by the utility for plant. Counsel argues that unless some adjustment is made to the rate base of the unamortized portion of the gain during the amortization, the utility receives the benefit of a $1000 rate base before it has paid for one.

The question presented to us on this point of appeal appears to be one of first instance. Although substantial authority exists for the application of such gain to the cost of interest amortized over the remaining life of the reacquired debt, neither we nor counsel are able to point to another court wherein the question of amortizing the gain to interest expense has been concurrently ordered with a reduction of rate base by the unamortized gain. We have been informed in the brief of Counsel that the regulatory agency of North Carolina in the Matter of Application of Piedmont Natural Gas Company, in an order dated December 11, 1985, determined that the proper rate-making treatment to be afforded to gain from reacquired debt is to

> (1) amortize the gain from the defeasance as a reduction to the cost of service, over the remaining life of the defeased debt; (2) reduce the company's rate base by the unamortized gain.

We do not perceive that the order of PSC on unamortized gain is confiscatory in nature. All agree that the objective must be to return the full amount of gain to the rate payer. Unless a reduction is made to rate base during the period of amortization, the rate payer will be required to pay in that

period a return calculated on a rate base which is in fact larger than the cost to the utility, because of the repurchase of the debt at less than face value.

Using the example cited to us in brief, if MDU issued a $1000 bond, and reacquired it for $900 when it had a remaining life of five years, these results under PSC order would follow: In the first year, $20 would be deducted from interest expense, and $80 would be reducted from the utility rate base. In the second year, another $20 would be deducted from interest expense, and the rate base reduction would be $60. At the end of five years, the utility would have regained its rate base and the rate payer would have received the full benefit of the $100 gain. In the meantime, during the period of amortization, the rate payer would not be charged with the rate of return on gain not yet refunded to him. The shareholder is not undercompensated during the period of amortization because his rate of return is based on the actual cost of his investment.

By analogy, our statutes command this result. Under § 69-3-108, MCA, the rate base for utility property can be valued at no more than its original cost.

The PSC order does not mean that MDU must revise its rate base in its regular accounts. An item may be treated differently for accounting and rate-making purposes. Public Systems v. FERC (D.C. Cir. 1979), 606 F.2d 973.

If the gain were recognized and used to reduce interest expense in the year the gain was realized, there would be no need, of course, for treatment of the unamortized gain. It is because good rate-making practice requires the gain to be amortized over the remaining life of the indebtedness, and the amortized amount subtracted from the test period interest

expense (Consolidated Gas Supply Company v. FERC, supra), that it then becomes necessary to consider the proper method of treating the unamortized gain.

The difference between our view and that of the District Court, and the intensity of positions taken by the parties in their briefs to this Court all indicate strong arguments that can be made for both sides of this issue. In such a case, it behooves courts to defer to the expertise of the regulatory commission whose duty is the fair protection of all the parties, the rate payers, the investors, and the shareholders of the utility. We remind ourselves that:

> It follows that the responsibilities of a reviewing court are essentially three. First it must be determined whether the commission's order, viewed in light of the relevant facts and of the commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character of future development of the industry.. . .

Permian Basin Area Rate Cases (1968), 390 U.S. 747, 792, 88 S.Ct. 1344, 1372-73, 20 L.Ed.2d 312, 350.

We determine that PSC's order is not in fact confiscatory as to the utility or its shareholders and is an

order reasonably devised to produce an equitable result for the rate payers.  In the circumstances, therefore, we reverse the order of the District Court on this point of appeal.

IV.

A final issue raised by MDU is that this Court should order a refund or surcharge to make MDU whole.  The issue, of course, depend on the success of MDU's appeal.  In view of our holdings here, we withold any comment on the propriety of the issue.

Affirmed in part and reversed in part.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

- 19 -